UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 10-50090-JLV |
| | ) | |
| Plaintiff, | ) | ORDER DENYING |
| | ) | DEFENDANT'S MOTION |
| vs. | ) | TO SUPPRESS OR |
| | ) | EXCLUDE EVIDENCE |
| JOHN DAVID LOOKING ELK, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Pending before the court is defendant John David Looking Elk's motion to suppress statements provided to a tribal law enforcement officer on May 16, 2010. (Docket 49). Mr. Looking Elk challenges the admission of the statements on the following grounds: (1) law enforcement violated the Fifth Amendment by subjecting him to custodial interrogation without providing Miranda[1] warnings; (2) the government failed to timely comply with its discovery obligations under Fed. R. Crim. P. 16 and should be sanctioned; and (3) the government's late disclosure of the statements violated his right to a fair trial under the due process clause of the Fifth Amendment. (Dockets 49, 50, & 56). The government resists Mr. Looking Elk's motion in its entirety. (Docket 55). The court held an evidentiary hearing on the motion on February 23, 2011. Both parties filed simultaneous briefs on February 28, 2011. (Dockets 55 & 56). Therefore, Mr. Looking Elk's motion is ripe for adjudication.

---

[1]Miranda v. Arizona, 384 U.S. § 436 (1966).

## FACTS AND PROCEDURAL HISTORY

As noted, the court held an evidentiary hearing on Mr. Looking Elk's motion on February 23, 2011.  Mr. Looking Elk appeared in person and by his counsel, Assistant Federal Public Defender Gary Colbath, Jr.  The government appeared by Assistant United States Attorneys Sarah Collins and Robert Mandel.  Four witnesses testified at the hearing: Officer Jessie Black Elk, a law enforcement officer with the Oglala Sioux Tribe Department of Public Safety; Special Agent Sherry Rice of the Federal Bureau of Investigation ("FBI"); Assistant United States Attorney Mark Vargo; and Assistant United States Attorney Sarah Collins.  From the evidence presented at the hearing, the court adduces the following facts.  The court also takes judicial notice of the record in this case.

On May 16, 2010, at approximately midnight, Officer Black Elk and Officer Clayton Ten Fingers[2] were traveling together[3] in a patrol vehicle to the scene of an incident when they came upon a vehicle in a ditch.  (ST 3:14-20).[4] The officers called dispatch to report the accident.  (ST 3:20).  Dispatch informed them a call about the wreck had just come in.  (ST 3:21-22).  May 16,

---

[2]Officer Clayton Ten Fingers is a law enforcement officer with the Oglala Sioux Tribe Department of Public Safety.

[3]Officers Ten Fingers and Black Elk were traveling east of Pine Ridge, South Dakota.

[4]The court shall cite to the transcript of the suppression hearing as "ST" followed by the page number(s) and line number(s) where the corresponding information may be found.  For example, information found at p. 3, lines 14-20 of the transcript shall be cited to as "ST 3:14-20."

2010, was Officer Black Elk's first day of employment as a tribal law enforcement officer. (ST 3:3-13).

Officers Black Elk and Ten Fingers were the first officers to arrive at the scene.[5] (ST 4:5-7). Officer Black Elk exited the patrol unit and approached the vehicle in the ditch. (ST 4:8-11). She saw a dead man lying on the ground. (ST 4:11-12, 21-24). Officer Black Elk identified the individual as Antoine Running Bear. (ST 4:18-20). Officer Black Elk shut off the vehicle's engine and returned to the patrol unit to advise Officer Ten Fingers of the situation. (ST 4:13-16). Officer Ten Fingers notified dispatch of Mr. Running Bear's death. (ST 4:15-17).

Approximately five minutes later, two individuals arrived at the scene together–Mr. Looking Elk and Matt Wilson.[6] (ST 4:25; 5:1-16). Both individuals were running, and Mr. Looking Elk was out of breath and crying hysterically. (ST 5:17-20). Mr. Looking Elk was on a cell phone, but he terminated the call when asked to do so by Officer Black Elk. (ST 6:2-10). Officer Black Elk began to question Mr. Looking Elk, asking him several times "what was going on, but he just kept shaking his head toward [her]." (ST 5:20-22). Mr. Looking Elk stated he was sorry. (ST 13:2). Officer Black Elk asked Mr. Looking Elk why he was sorry. (ST 13:2-3). Mr. Looking Elk stated approximately three times "he had hurt his friend[.]" (ST 6:15-18; 13:2-3).

---

[5]It is unclear if any additional officers arrived at the scene at any point.

[6]At some point, Mr. Looking Elk's custodian or care giver, "Ms. Twiss," arrived at the scene. (ST 21:22-25; 22:1-2).

Although Officer Black Elk inquired, Mr. Looking Elk never identified the friend. (ST 6:16-17). Officer Black Elk asked Mr. Looking Elk "who was driving with him or who was driving in the vehicle with him[,]" but Mr. Looking Elk was unable to respond. (ST 6:18-20; 13:15-20). Officer Black Elk then asked Mr. Looking Elk if he was the driver, to which Mr. Looking Elk responded by shaking his head "yes" and then shaking his head "no." (ST 6:20-22). Mr. Looking Elk repeated the gestures each time Officer Black Elk asked if he was the driver. (ST 6:22-23). When questioning Mr. Looking Elk, Officer Black Elk did not have her weapon drawn or make any threats or promises. (ST 7:4-15).

Officer Black Elk also spoke with Mr. Wilson. (ST 5:23). Mr. Looking Elk had gone to Mr. Wilson's residence to use the phone and told Mr. Wilson he had been in a "wreck just across the road." (ST 5:24-25; 6:1).

Mr. Looking Elk attempted to approach Mr. Running Bear's body and began to drop to his knees. (ST 6:24-25; 7:1; 13:20-23). Officer Black Elk held him to prevent him from doing so and assisted him to his feet by supporting him underneath one arm. (ST 7:16-20; 8:5, 12-15; 13:24-25; 14:1). During this time, Mr. Looking Elk indicated he could not breathe and was experiencing pain in his chest. (ST 8:2-3). In response to Mr. Looking Elk's increasing hysteria, Officer Black Elk informed Mr. Looking Elk of her intention to place him in the back of the patrol unit to allow him to calm down. (ST 6:23; 7:2-3, 23-25). Officer Black Elk advised Mr. Looking Elk medics were on the way and placed him in the back seat of the patrol unit. (ST 8:5-7). Officer Black Elk did

so because she was unaware if Mr. Looking Elk sustained internal injuries. (ST 8:6-8).

Officer Black Elk did not restrain Mr. Looking Elk with handcuffs. (ST 8:16-18). The rear door of the patrol vehicle remained open, allowing Mr. Looking Elk to sit sideways, presumably with his feet on the pavement. (ST 8:19-25; 9:1). The patrol unit had a cage separating the front and back seats. (ST 8:22-24). Officer Black Elk never drew her weapon or made any threats or promises. (ST 9:2-5). Officer Black Elk never observed any officer placing Mr. Looking Elk in handcuffs. (ST 9:6-9). At no time did Officer Black Elk administer Miranda warnings to Mr. Looking Elk or observe another officer doing so. (ST 23:10-14).

Officer Black Elk again questioned Mr. Looking Elk when he was seated in the back of the patrol unit. (ST 9:10-12). She asked Mr. Looking Elk several times whether he was driving the vehicle at the time of the accident. (ST 9:13-14). Mr. Looking Elk kept shaking his head in the affirmative, then in the negative. (ST 9:14-23). Mr. Looking Elk was hysterical and crying at this time. (ST 9:12-13). The medics arrived, and Officer Black Elk reported Mr. Looking Elk's complaints of shortness of breath and chest pain. (ST 16:22-25). Officer Black Elk had no further contact with Mr. Looking Elk after turning him over to the care of the medics. (ST 20:2-7). Officer Black Elk was not present during the medics' interaction with Mr. Looking Elk and did not hear or see Mr. Looking Elk make any additional comments or gestures. (ST 17:1-11). The

medics transported Mr. Looking Elk to the hospital via an ambulance.[7]  (ST 17:5-7).

From her initial contact with Mr. Looking Elk, Officer Black Elk knew Mr. Looking Elk had been drinking as she smelled alcohol on his breath.  (ST 13:7-14).  Once Officer Black Elk determined the accident involved a fatality and Mr. Looking Elk had been drinking, Mr. Looking Elk was not free to leave the scene except to obtain medical treatment.  (ST 15:4-23).

That evening, Officer Black Elk related her conversation and interaction with Mr. Looking Elk to Officer Ten Fingers.  (ST 23:23-25; 24: 1-6).  New to the department, Officer Black Elk did not prepare an incident report because her supervisor turned the case over to Officer Ten Fingers and asked Officer Ten Fingers to prepare the report.[8]  (ST 17:17-21; 21:3-7).

On September 21, 2010, the government indicted Mr. Looking Elk on one count of involuntary manslaughter, a violation of 18 U.S.C. §§ 1112 and 1153.  (Docket 1).  The indictment alleged, on or about May 16, 2010, Mr. Looking Elk unlawfully killed Mr. Running Bear by operating a vehicle while under the influence of alcohol and by driving in an unsafe manner.  In anticipation of

---

[7]It was the policy of the Oglala Sioux Tribe Department of Public Safety for a law enforcement officer to escort a person in custody to the hospital.  (ST 22:10-19).  No officer escorted Mr. Looking Elk to the hospital.  (ST 22:20-22).  Later that evening, tribal law enforcement arrested Jonathan Catches in connection with the accident, and an officer accompanied him as he received medical attention.  (ST 22:22-25; 23:1-4).

[8]The court admitted Officer Ten Fingers' report at the suppression hearing as Exhibit 1.

trial, the parties entered into three stipulations: (1) the offense occurred in Indian country and Mr. Looking Elk is an Indian person; (2) on May 16, 2010, Mr. Looking Elk had a blood alcohol content of 0.132% by weight, Mr. Running Bear had a blood alcohol content of 0.361% by weight, and Mr. Catches, who may have been in the vehicle at the time of the accident, had a blood alcohol content of 0.183% by weight; and (3) Mr. Running Bear died as a result of multiple blunt-force trauma.  (Docket 26, pp. 4-6).  The only factual dispute is whether Mr. Looking Elk caused Mr. Running Bear's death, that is, whether Mr. Looking Elk was driving the vehicle at the time of the accident.

The court entered its standing order on September 27, 2010.  (Docket 11).  In relevant part, the standing order required the government to comply with requests for discovery under Fed. R. Civ. P. 16(a) and to furnish all Brady,[9] Giglio,[10] and Jenks Act[11] materials to Mr. Looking Elk.  Id. at ¶¶ 5-8.

After granting a continuance at the request of Mr. Looking Elk, the court eventually set the pretrial conference for February 18, 2011, and the commencement of trial for February 22, 2011.  (Docket 15).

On or about February 10, 2011, as part of the government's trial preparation, Agent Rice contacted Officer Black Elk to discuss her compliance with the trial subpoena.  (ST 29:2-3; 30:3-7).  This telephone conversation was the first and only time Agent Rice and Officer Black Elk were in contact about

---

[9] Brady v. Maryland, 373 U.S. 83 (1963).

[10] Giglio v. United States, 405 U.S. 150 (1972).

[11] 18 U.S.C. § 3500.

this case.  (ST 24:7-12; 25:19-23).  During the conversation, Officer Black Elk discussed her contact with Mr. Looking Elk at the scene of the accident.  (ST 30:8-12).  Officer Black Elk stated she asked Mr. Looking Elk if he was driving the vehicle at the time of the accident.  (ST 25:1-3; 30:13-13-15).  Officer Black Elk stated Mr. Looking Elk shook his head in the affirmative, then in the negative and kept repeating " 'I'm sorry, I'm sorry,' and didn't give any direct answer to whether or not he was driving."[12]  (ST 25:4-11; 30:16-21).  Officer Black Elk also stated she prepared a report documenting her contact with Mr. Looking Elk–a report which Agent Rice was unaware of and did not possess.  (ST 29:6-8, 12-13; 32:10-11).  Agent Rice told Officer Black Elk to contact Ms. Collins immediately.  (ST 29:18-21).

After ending her conversation with Officer Black Elk, Agent Rice immediately contacted AUSA Collins.  (ST 29:11-13).  Agent Rice understood the government might use Mr. Looking Elk's statements as evidence in the case.  (ST 30:22-25; 31:1-2).  Agent Rice knew the primary dispute in the case was over who was driving the vehicle at the time of the accident.  (ST 31:10-15).  In her conversation with AUSA Collins, Agent Rice stated Officer Black Elk "had good recall of that evening, apparently because it was her first night of work."  (ST 32:8-10).  Agent Rice stated Officer Black Elk had prepared a report of the incident.  (ST 32:10-11).  Agent Rice sought guidance on whether she

---

[12]Sometime prior to February 10, 2011, Agent Rice spoke to Officer Ten Fingers about the accident, but Officer Ten Fingers did not relate any information regarding Officer Black Elk's conversation or contact with Mr. Looking Elk.  (ST 31:20-25; 32:1-2).

should prepare a 302 report documenting her conversation with Officer Black Elk or whether the government would rely on Officer Black Elk's report.  (ST 32:12-15).  It was Agent Rice's understanding from speaking with Ms. Collins that the government would rely on Officer Black Elk's report.  (ST 32:15-16).  Thus, Agent Rice did not prepare a report.  (ST 33:16-22).  Finally, Agent Rice testified she informed AUSA Collins that Officer Black Elk had some contact with Mr. Looking Elk, but did not go into great detail because she believed Officer Black Elk wrote a report detailing the contact.  (ST 32:12, 20-25; 33:1-6).  AUSA Collins denies Agent Rice informed her of this information.  (ST 34:8-11; 51:5-20).  Agent Rice did not make any further attempts to locate Officer Black Elk's report.  (ST 33:13-15).

Immediately after this telephone conversation ended, Officer Black Elk contacted AUSA Collins.[13]  (ST 51:18-21).  Ms. Collins inquired if Officer Black Elk was available to testify at trial and whether she wrote a report.  (ST 51:21-24).  Officer Black Elk answered in the affirmative to both questions.  (ST 51:25).  Ms. Collins told Officer Black Elk to provide the report immediately and to call back.  (ST 52:1-2).  Officer Black Elk did not provide the report (because it did not exist) or call Ms. Collins again.  (ST 52:2-3).  Ms. Collins did not follow up with Officer Black Elk to ascertain the status of the report.  (ST 52:21-23).  Ms. Collins assumed, because Officer Black Elk did not call again,

---

[13]In reading Officer Ten Fingers' report, Ms. Collins believed Officer Black Elk was "quite ancillary[]" to the investigation, that is, primarily a scene witness.  (ST 49:17-21; 50:2).  Ms. Collins assumed Mr. Looking Elk did not make statements to Officer Black Elk because Officer Black Elk did not write a report.  (ST 49:24-25; ST 50:1-2).

she did not find the report.  (ST 57:12-15).  AUSA Collins never spoke to Agent

Rice again about Officer Black Elk or the existence of her report.  (ST 54:15-

17).  Additionally, no one followed up on Officer Ten Fingers' statement in his

report that he "advised Officer J. Black Elk to get information from the males

involved."  (ST 56:10-25; 57:1-5; see also Exhibit 1 at p. 2).

On or about February 16, 2011, Mr. Colbath and Ms. Collins met to

discuss the case.  (ST 41:24-25; 42;1-2; HT 2:16-17).[14]  Mr. Colbath was in

receipt of the government's witness list, which listed Officer Black Elk as a

witness.  (HT 2:6-9).  He specifically asked AUSA Collins if any tribal law

enforcement officer other than Officer Ten Fingers had prepared a report of the

incident.  (HT 2:18-20).  Ms. Collins confirmed there were no additional reports.

(HT 2:20).  Mr. Colbath also asked "now, none of these people interviewed my

client or are going to come to court and say there are statements that my client

made at the scene that I don't know about, are they?"  (HT 2:22-25).

AUSA Collins answered "no or not that she was aware of[.]"  (HT 2:25; 3:1).

Sometime during the week of February 14, 2011, Ms. Collins asked

AUSA Vargo to contact Officer Black Elk to discuss her testimony.  (ST 39:5-

11).  Mr. Vargo planned to second-chair the trial.  (ST 38:24-25).  Ms. Collins

told Mr. Vargo that Officer Black Elk had "good recollection" of the incident

because it was her first night on duty.  (ST 40:7-10).  Mr. Vargo understood

---

[14]On February 22, 2011, the court held a hearing to determine how the
case should proceed in light of the newly-disclosed evidence.  The court shall
refer to the transcript of the status conference as "HT" followed by the page
number(s) and line number(s) where the corresponding information may be
found.

10

from Ms. Collins that Officer Black Elk was a "scene witness; that she was the first or one of the first officers on the scene; that her involvement was largely limited to describing the location of the victim, location of the vehicle, and . . . the arrival of the defendant, Mr. Looking Elk; and . . . she' s the officer that passed him along to the EMT's when the EMT's first got there." (ST 39:17-24). Mr. Vargo did not learn of Mr. Looking Elk's statements from Ms. Collins. (ST 40:11-13).

On Friday, February 18, 2011,[15] AUSA Vargo called Officer Black Elk to review her testimony.[16] (ST 40:4-7; 41:3-5). Officer Black Elk told Mr. Vargo that Mr. Looking Elk made statements to her. (ST 40:13-17). Mr. Vargo informed Ms. Collins of this information on Monday, February 21, 2011,[17] at approximately 10:20 a.m. (ST 40:18-19; 50:16-19). Mr. Vargo believes this was the first time Ms. Collins knew of Mr. Looking Elk's statements. (ST 40:20-24). Ms. Collins testified Mr. Vargo was the first person to inform her of Mr. Looking Elk's statements. (ST 50:16-22).

---

[15]On February 18, 2011, at 9 a.m., the court held a pretrial conference in anticipation of trial. The court finalized the preliminary jury instructions and ruled on Mr. Looking Elk's motions *in limine*. No mention was made of the possible existence of an undisclosed report prepared by Officer Black Elk or statements made by Mr. Looking Elk.

[16]Mr. Vargo testified it was his impression Officer Ten Fingers was the "more involved" officer because he had written the report. (ST 44:8-12). Mr. Vargo would expect an officer to write a report if a defendant made statements. (ST 44:16-17).

[17]The court notes February 21, 2011, was a federal holiday, and all federal agencies were closed.

At 10:55 a.m. on February 21, 2011, AUSA Collins sent the following e-mail to Mr. Colbath:

> Vargo spoke to Officer Black Elk on the phone and she said: she spoke to your client for 10-15 min. prior to medics arriving.  He kept saying he was sorry.  When asked if he was driving he alternated between yes and no.  He would become very upset by the question.  When she asked "who was driving" he responded "I don't know."  She did not do a report.

(Exhibit 1 of the February 22, 2011, Hearing).

At 2:29 p.m. on February 21, 2011, Mr. Colbath sent the following e-mail to court staff:

> I just received notice of something from Sara [Collins] regarding a government witness and I need to take it up on the record with the Judge before trial starts, can you visit with him and let me know when or how he wants to handle it. . . .

Because of the February 21, 2011, holiday, the court did not become aware of this development until 8 a.m. on February 22, 2011, the day of trial. Prospective jurors arrived at 8 a.m.  Outside the presence of the venire, the court held a hearing on this matter at approximately 8:45 a.m.  (Docket 40). During the hearing, Mr. Colbath moved the exclude Mr. Looking Elk's statements as a discovery sanction against the government.  Id.  Mr. Colbath also moved for a suppression hearing to determine if Officer Black Elk violated Mr. Looking Elk's constitutional rights.  Id.  In the event the court declined to exclude the evidence as a discovery sanction, Mr. Colbath moved for a continuance of the trial to allow sufficient time to conduct a suppression hearing.  Id.  The court denied the motion to exclude the evidence as a discovery sanction, but granted the motion for a continuance.  Id.

12

The court reconvened to inform the venire that a serious and unanticipated evidentiary matter arose requiring the trial to be continued.  Id. The court excused the venire.  Id.  The court and the parties then discussed how the case should proceed.  Id.  The court scheduled the suppression hearing for February 23, 2011, the pretrial conference for March 4, 2011, and the trial to commence on March 7, 2011.  Id.  The court immediately entered a scheduling order to that effect.  (Docket 48).  The court held the suppression hearing at the scheduled time and permitted the parties to file supplemental briefs.

## DISCUSSION

Mr. Looking Elk moves to suppress or exclude his May 16, 2010, statements to Officer Black Elk on three grounds: (1) the statements were the product of custodial interrogation taken without the advisement of Miranda warnings, thereby violating the Fifth Amendment;[18] (2) the government violated its discovery obligations by failing to timely disclose the statements; and (3) the late disclosure of the statements violated Mr. Looking Elk's right to a fair trial under the due process clause of the Fifth Amendment.  (Dockets 49, 50, & 56). The court will address each argument in turn.

---

[18]The court notes Mr. Looking Elk does not allege his statements were involuntary under the Fifth Amendment.

13

**A.      Whether the Statements Should be Suppressed Under <u>Miranda</u> and the Fifth Amendment**

As a preliminary matter, the court notes the burden is on the government to prove Mr. Looking Elk's statements were not taken in violation of <u>Miranda</u>.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986).

The Fifth Amendment privilege against self-incrimination provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.  In <u>Miranda</u>, the Supreme Court established "prophylactic procedural rules" to safeguard an individual's Fifth Amendment privilege against self-incrimination.  <u>United States v. Vanover</u>, 630 F.3d 1108, 1114 (8th Cir. 2011).  The holding in <u>Miranda</u> "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990); <u>United States v. Black Bear</u>, 422 F.3d 658, 661 (8th Cir. 2005) (same). <u>Miranda</u> warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may chose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."  <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987). A <u>Miranda</u> warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  <u>Unites States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007).

14

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a person.  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  It is clear Officer Black Elk's direct questioning of Mr. Looking Elk at the scene of the accident satisfies the definition of interrogation.  The only question is whether Mr. Looking Elk was "in custody" within the meaning of Miranda when he made statements to Officer Black Elk. " 'Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'  It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.' "  United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (emphasis in original) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

A person is considered to be "in custody" either upon his formal arrest or "under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 440 & 442.  "Two discrete inquiries are essential to the [in custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  Thompson v. Keohane, 516 U.S. 99, 112 (1995).  "Thus, the critical inquiry is not whether the interview took place

15

in a coercive or police dominated environment, but rather whether the
defendant's 'freedom to depart was restricted in any way.' " LeBrun, 363 F.3d
at 720 (quoting Mathiason, 429 U.S. at 495).  "In answering this question,
[courts] look at the totality of the circumstances while keeping in mind that
this determination is based 'on the objective circumstances of the
interrogation, not on the subjective views harbored by either the interrogating
officers or the person being questioned.' " Id. (quoting Stansbury v. California,
511 U.S. 318, 322-23 (1994)).

In looking at the totality of the circumstances, courts may consider the
following six nonexclusive factors, often referred to as the Griffin factors:
(1) whether the person was informed he was free to leave and answering the
interrogator's questions was voluntary; (2) whether the person possessed
freedom of movement during the interrogation; (3) whether the person initiated
contact with the interrogator or voluntarily acquiesced to the interrogation;
(4) whether the interrogator employed strong-arm tactics or strategies;
(5) whether the atmosphere of the interrogation was dominated by the police;
and (6) whether the person was arrested at the close of the interrogation.
Flores-Sandoval, 474 F.3d at 1146-47 (citing Griffin, 922 F.2d at 1349).  The
first three factors are "mitigating factors which, if present, mitigate against the
existence of custody at the time of questioning." United States v. Axsom, 289
F.3d 496, 500-01 (8th Cir. 2002).  The last three factors are "aggravating
factors which, if present, aggravate the existence of custody." Id. at 501.
These factors are helpful, but not exclusive, and custody "cannot be resolved

merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Flores-Sandoval, 474 F.3d at 1147.  Courts also may consider the place where the interrogation took place, the purpose of the interrogation, and the length of the interrogation, although these considerations are not determinative.  Griffin, 922 F.2d at 1348.

In looking at the totality of the circumstances of the interrogation at the scene of the accident, the court finds Mr. Looking Elk was not "in custody" so as to trigger the panoply of Miranda protections.  The interrogation occurred in the open in view of any passerby or other motorist, not in the police-dominated atmosphere of a police station.  "This exposure to public view reduces the ability of an unscrupulous policemen to use illegitimate means to elicit self-incriminating statements and diminishes the [person's] fear that, if he does not cooperate, he will be subject to abuse." Berkemer, 468 U.S. at 438.  Only one law enforcement officer, Officer Black Elk, interrogated Mr. Looking Elk; indeed, it appears only Officer Black Elk and Officer Ten Fingers were present at the scene.  There is no evidence Officer Black Elk employed strong-arm or coercive tactics or exerted any psychological pressure on Mr. Looking Elk to answer her questions.  There is no evidence Officer Black Elk harassed or intimidated Mr. Looking Elk.  Officer Black Elk's physical appearance and stature are not imposing.  Although Officer Black Elk initiated the interrogation, it appears Mr. Looking Elk voluntarily participated to the extent he was capable given his agitated emotional state.  Many times, Mr. Looking Elk was unable to respond, yet Officer Black Elk took no measures designed to

17

force answers to her questions.  The length of the interrogation was brief and the circumstances unexceptional and unobjectionable.

Officer Black Elk never drew her weapon or restrained Mr. Looking Elk in any way.  Officer Black Elk never handcuffed Mr. Looking Elk.  Officer Black Elk assisted Mr. Looking Elk to the patrol unit, but such contact was brief and not done to restrain or intimidate Mr. Looking Elk, but rather to help him.  The only reason Officer Black Elk escorted Mr. Looking Elk to the patrol unit was because Mr. Looking Elk complained of shortness of breath and chest pain and Officer Black Elk was unsure if he was injured internally.  The rear door to the patrol unit remained open at all times.  When the medics arrived, Officer Black Elk removed herself from the situation.  Importantly, Officer Black Elk allowed the medics to transport Mr. Looking Elk without a police escort, which, given the policy of the tribe's Department of Public Safety, strongly suggests Mr. Looking Elk was not under arrest.  Office Black Elk did not arrest Mr. Looking Elk at the conclusion of the interrogation.  See United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) (the fact that the defendant was not arrested upon conclusion of an interview was a "very important factor weighing against custody").

It is true Officer Black Elk observed Mr. Looking Elk had been drinking and she likely considered Mr. Looking Elk a suspect or the focus of the investigation.  It is also true Officer Black Elk would not have allowed Mr. Looking Elk to leave the scene except to receive medical attention.  However, these facts are of little significance unless Officer Black Elk communicated this

18

information to Mr. Looking Elk and the information contributed to Mr. Looking

Elk's "sense of custody." Griffin, 922 F.2d at 1348; see also United States v.

Carter, 884 F.2d 368, 370 (8th Cir. 1989) (same); Berkemer, 468 U.S. at 421

(noting, even if the officer knew at the outset he intended to arrest the

defendant, an officer's "unarticulated plan has no bearing on the question

whether a suspect was 'in custody' at a particular time").

 The court finds Officer Black Elk did not advise Mr. Looking Elk he was not under arrest

and could decline to answer her questions.  " '[T]he most obvious and effective

means of demonstrating that a suspect has not been taken into custody . . . is

for the police to inform the suspect that an arrest is not being made and that

the suspect may terminate the interview at will.' " United States v. Czichray,

378 F.3d 822, 826 (8th Cir. 2004) (quoting Griffin, 922 F.2d at 1349).  This

factor, however, is not dispositive and is but one of many the court considers.

 The court finds the circumstances surrounding the interrogation similar

to roadside questioning pursuant to a traffic stop or the brief detention

associated with a Terry[19] stop.  Further, the Miranda court specifically

---

[19]Terry v. Ohio, 392 U.S. 1 (1968).  A Terry stop occurs when a police
officer, without probable cause but with a reasonable suspicion that criminal
activity may be afoot, briefly detains a suspicious person in order to investigate
the circumstances that provoked the suspicion.  Berkemer, 468 U.S. at 439;
Terry, 392 U.S. at 30.  The Court of Appeals for the Eighth Circuit extended the
holding in Berkemer, which applies to traffic stops, to Terry stops.  See United
States v. Pelayo-Ruelas, 345 F.3d 589, 593 (8th Cir. 2003).  In Berkemer,
the Supreme Court clarified law enforcement need not provide Miranda warnings
before questioning a vehicle's occupants during a routine traffic stop and prior
to formal arrest.  Berkemer, 468 U.S. at 437-39.

exempted from its purview "[g]eneral on-the-scene questioning as to facts surrounding a crime[,]" which does not present "the compelling atmosphere inherent in the process of in-custody interrogation[.] Miranda, 384 U.S. at 477-78. Officer Black Elk's questions were appropriate and typical given the circumstances. Consistent with the traditional duty of law enforcement, Officer Black Elk, as a first responder, attempted to determine what happened and how the players fit together. Officer Black Elk's questions were open-ended, non-accusatory, and investigative. The court finds "[g]eneral on-the-scene questioning" includes questions such as "what happened," "who was in the vehicle," and "who was driving," given a vehicular accident occurred.

In sum, given the totality of the circumstances surrounding Mr. Looking Elk's interaction with Officer Black Elk, the court finds a reasonable person in Mr. Looking Elk's position would not have believed his freedom of action had been curtailed to a degree associated with a formal arrest. The evidence overwhelmingly supports the conclusion the circumstances of the interrogation did not rise to the level of a *custodial* interrogation. Mr. Looking Elk was not under formal arrest or deprived of his freedom of action in any significant way. The court concludes Mr. Looking Elk was not in custody at the scene of the accident and Officer Black Elk was not required to administer Miranda warnings prior to questioning Mr. Looking Elk.

**B.      Whether the Statements Should be Excluded as a Discovery Sanction**

The parties do not dispute Mr. Looking Elk requested discovery of evidence within the government's possession under Fed. R. Crim. P. 16.  Under Rule 16(a)(1)(A), "the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial."  Fed. R. Crim. P. 16(a)(1)(A).  Rule 16(c) imposes a continuing duty on a party "who discovers additional evidence or material before or during trial" to "promptly disclose its existence to the other party or the court . . . ."  Fed. R. Crim. P. 16(c).

Under Rule 16(d)(2), the court has the authority to sanction any party for failing to comply with its discovery obligations.  This section provides as follows:

> **Failure to Comply.**  If a party fails to comply with this rule, the court may:
>
> (A)      order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> (B)      grant a continuance;
>
> (C)      prohibit that party from introducing the undisclosed evidence; or
>
> (D)      enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).  The court has broad discretion to impose sanctions for discovery violations.  <u>United States v. Davis</u>, 244 F.3d 666, 670 (8th Cir.

21

2001).  However, the court must impose the least severe sanction that will adequately punish the non-compliant party, here, the government, and secure future compliance.  United States v. DeCoteau, 186 F.3d 1008, 1010 (8th Cir. 1999).  In most cases, a continuance is the most desirable and feasible remedy for the government's failure to comply with its discovery obligations.  United States v. Peveto, 881 F.2d 844, 863 (10th Cir. 1989); see also United States v. Johnson, 228 F.3d 920, 926 (8th Cir. 2000) (finding the district court abused its discretion in excluding untimely-disclosed evidence without considering the possibility of a less severe sanction such as granting a continuance).

Consistent with other circuits, the Court of Appeals for the Eighth Circuit set forth the following factors to consider when imposing sanctions on the government in these circumstances:

> In determining a suitable and effective sanction, a court must weigh the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government.

DeCoteau, 186 F.3d at 1010; see also Davis, 244 F.3d at 670 (same).  These factors offer guidance to the district court, but are not exhaustive or dispositive.  Davis, 244 F.3d at 670-71.  Further, "even in the absence of prejudice, the integrity of the judicial process and scheduling considerations alone may justify suppression of otherwise admissible evidence offered by the delinquent party if the discovery violation was intentional or willful."  Id. at 673 (citations and internal quotation marks and brackets omitted).

22

Here, the government clearly had a duty to seek out and disclose the evidence in question.  See Fed. R. Crim. P. 16 and the court's standing order (Docket 11).  The court finds the government failed to satisfy its discovery obligations.  "Delayed disclosure is inconsistent with the discovery obligations set forth in Fed. R. Crim. P. 16, which are designed 'to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.' "  Davis, 244 F.3d at 673 n. 4 (quoting Fed. R. Crim. P. 16 advisory committee note).

Based on the record in this case, the court finds the government did not intentionally or in bad faith orchestrate the late discovery.  The government gained no tactical advantage by the late disclosure.  It is clear the government's wrongdoing was due to a lack of preparation, lack of diligence, and a general carelessness on the part of AUSA Collins, AUSA Vargo and Agent Rice.  How the government seriously intends to satisfy its discovery obligations when it makes little to no effort to determine what discovery exists is beyond the comprehension of the court.  The prosecutors and the FBI case agent knew from the beginning the identify of the driver was the central issue in this vehicular homicide case.  How could they not inquire whether tribal officers interrogated Mr. Looking Elk at the scene?  The failure to do so may only be attributed to negligence.

The government engaged in a series of missteps.  The government indicted Mr. Looking Elk on September 21, 2010, over five months ago.  Yet, it was not until approximately February 10, 2011, that any government actor made contact with Officer Black Elk.  Although Officer Black Elk was one of only two law enforcement officers first present at the scene of the accident, federal authorities ignored the reality she may have discoverable information.  In his report dated May 18, 2010, Officer Ten Fingers directed Officer Black Elk to obtain information from Mr. Looking Elk.  Agent Rice, AUSA Vargo and AUSA Collins were familiar with the report, yet made no attempt to follow up with Officer Black Elk to determine if, in fact, she obtained information from Mr. Looking Elk.

A mere two weeks before trial, Agent Rice finally contacted Officer Black Elk to discuss not her involvement in the case, but rather her compliance with the trial subpoena.  There is no dispute Officer Black Elk informed Agent Rice of her conversation and contact with Mr. Looking Elk.  Whether Agent Rice advised AUSA Collins of this information is irrelevant.  <u>Accord</u> <u>United States v. Risha</u>, 445 F.3d 298 (6th Cir. 2006) (reviewing inter-circuit case law and noting, within the context of <u>Brady</u>, courts routinely consider prosecutors to be in constructive possession of information obtained by government agents involved in the investigations and acting on behalf of the prosecution).  If Agent Rice did not provide this information to Ms. Collins, such carelessness is remarkable.  If AUSA Collins received this information from Agent Rice, but did

not inquire further, such carelessness equally is disturbing.  There is no question a government actor possessed this information on February 10, 2011.

There is also no dispute Agent Rice informed AUSA Collins of the possible existence of an undisclosed report.  Yet, neither Agent Rice nor Ms. Collins expended any effort to obtain the report, despite the fact it would have been discoverable if it existed.  AUSA Collins met with Mr. Colbath on or about February 16, 2011, yet never mentioned the possible existence of the report. This troubling fact is another example of the government's carelessness.

Also unacceptable is the fact that, when AUSA Vargo learned of Mr. Looking Elk's statements, he did not contact immediately Ms. Collins, Mr. Colbath, or the court.  Mr. Vargo became aware of this information on Friday, February 18, 2011, in the afternoon.  He waited until the morning of Monday, February 21, 2011, to inform Ms. Collins about his discovery.  AUSA Collins immediately contacted Mr. Colbath.  Because of the federal holiday, the court did not learn of the situation until the morning of February 22, 2011, the first day of trial.  Approximately fifty prospective jurors had already arrived for jury selection.  The court does not take lightly the waste of their valuable time. Mindful of their civic duty, the prospective jurors expended considerable time and effort to be present for the trial notwithstanding inclement weather. Further, the court incurred considerable expense, approximately $3,192, to reimburse the prospective jurors for their mileage and fees.  (ST 63:6-8).  This waste of resources is inexcusable.

25

The court also does not take lightly the personal prejudice suffered by Mr. Looking Elk as a result of the two-week delay in trial.  Mr. Looking Elk is presumed innocent and has a statutory and constitutional right to a speedy trial by a fair and impartial jury.  Ordinarily, continuances in a criminal case are a matter of course and entirely justified.  However, the continuance in this case was avoidable entirely if the government had been diligent in satisfying its discovery obligations.  Further, the court rejects any argument that the prejudice to   Mr. Looking Elk is negated by his current non-custodial status. Although the court released Mr. Looking Elk on his own recognizance, Mr. Looking Elk is subject to numerous conditions and restraints on his liberty.  He faces significant penalties for violating the conditions of release. Importantly, the court is mindful of the hardship and stress imposed on the families of Mr. Looking Elk and the late Mr. Running Bear by the delay in the trial.

The question becomes what is the least severe and most appropriate sanction to remedy the prejudice and wrongdoing of the government.  Although frustrated by the situation, the court felt it was in the best interests of justice to continue the trial to allow sufficient time for a suppression hearing.  The court finds this continuance mitigated any prejudice to Mr. Looking Elk caused by the potential admission of the evidence at trial.  Mr. Looking Elk's attorney had the opportunity to fully explore the newly-disclosed evidence by cross-examining Officer Black Elk at the suppression hearing.  Mr. Looking Elk's counsel was able to observe Officer Black Elk's demeanor as a testifying witness and to assess her credibility.  Mr. Looking Elk will have sufficient opportunity to adjust his trial strategy in anticipation of the evidence.

Mr. Looking Elk urges the court to sanction the government by excluding the evidence even after the court granted a continuance.  However, Mr. Looking Elk provides no legal authority to justify excluding the evidence in addition to continuing the trial.  Nor is the court aware of any authority permitting the court to impose both sanctions concurrently.  Indeed, Rule 16(d) is written in the disjunctive "or," not the conjunctive "and."

As stated previously, the court takes seriously the personal stress and prejudice to Mr. Looking Elk caused by the two-week delay in trial.  However, excluding  otherwise admissible evidence will not cure that prejudice.  In this case, the court found it prudent to continue the trial, particularly since the court's calendar allowed for the prompt rescheduling of the trial.  This will not always be the case, and the court puts the government on notice that future wrongdoing may well result in the exclusion of otherwise admissible evidence. At this point, the court finds this admonishment and warning sufficient to deter future wrongdoing by the government and secure the government's compliance with the court's orders and the Federal Rules of Criminal Procedure.  Accordingly, the court declines to sanction the government further.

## C.   Whether the Statements Should be Excluded under the Fifth Amendment.

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." Lisenba v. California, 314 U.S. 219, 236 (1941).  "In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." Id.; see also United States v. Rubin, 836 F.2d 1096, 1101 (8th Cir. 1988) ("To

27

establish a denial of due process [under the Fifth Amendment], the acts complained of must be of such quality as necessarily prevents a fair trial.").

As stated previously, by granting a continuance of the trial and holding a suppression hearing, the court provided Mr. Looking Elk the opportunity to fully explore the newly-disclosed evidence by cross-examining Officer Black Elk.  Mr. Looking Elk was able to observe Officer Black Elk's demeanor as a testifying witness and to assess her credibility.  Mr. Looking Elk will have sufficient opportunity to adjust his trial strategy in anticipation of the evidence. In light of the approximate two-week continuance of the trial, the court cannot see how the government's late disclosure will deny Mr. Looking Elk a fair trial. Nor has Mr. Looking Elk explained how the government's untimeliness, however frustrating to all involved, will prevent a fair trial following the grant of a continuance.  See generally, Dockets 50 & 56.  Accordingly, the court rejects Mr. Looking Elk's argument as the government did not violate his Fifth Amendment right to a fair trial.[20]

## CONCLUSION

In accord with the above discussion, it is hereby

ORDERED that Mr. Looking Elk's motion to suppress or to exclude evidence (Docket 49) is denied.

Dated March 4, 2011.

BY THE COURT:

/s/ *Jeffrey L. Viken*_____
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

---

[20]Mr. Looking Elk does not allege the government violated Brady, Giglio, or the Jenks Act.